## HALE, ET AL. V. BROWN.

1. When an overseer is charged with the collection of accounts contracted with his employer's smith shop, the opinions of witnesses of the annual value of the work done is not evidence to show a set-off to a suit by the overseer, as he is chargeable only for the monies actually collected.

2. A debt due to two carrying on a smith shop jointly, and collected by an overseer, may be set-off by the administrators of the survivor to a suit against them in their representative capacity, by the overseer on a note made by the survivor; but the presumption arises that the debt was settled when the survivor afterwards gives his note to the overseer, and the judgment will not be reversed when the claim is rejected as a set-off, but is admitted to shew fraud in the settlement, and the verdict negatives the fraud.

3. There is no distinction between the capacity required to make different kinds of contracts. A legal capacity to make any contract, is a capacity to make all contracts.

4. When a note is taken from a person of weak intellect and an habitual drunkard, under suspicious circumstances, it is a strong badge of fraud, if the plaintiff does not make out a fair case, and good consideration— it being previously shewn, the note was given on a settlement of accounts, and the presumption created, either that nothing, or a less sum was due than the note called for.

Error to the County Court of Dallas.

Assumpsit by Brown against Hale and others, as the administrators of William C. Woods.

The declaration counts on a note made by the intestate on the 29th June, 1840, for $2221, payable one day after date to the plaintiff, or bearer, and also to recover $3000, alleged to be due for work and labor, &c. The defendants pleaded non assumpsit, set-off, statute of non-claim, statute of limitations, and other pleas. The suit was commenced the 26th of June, 1842.

At the trial the plaintiff put in the note described in the declaration, as well as evidence to prove his demand for work and labor. The defendant then introduced a witness, who testified he was acquainted with the intestate from boyhood

until his death, which took place in October, 1841, at the age of 26 years. He had an elder brother who died in August, 1839. These brothers inherited from their father a large fortune, containing a large number of slaves. No division of the property was ever made between the two brothers, but all was held jointly. The plantation was carried on by the two brothers until the death of the elder, and was afterwards kept up with the same hands by the survivor until his death. Attached to this plantation was a blacksmith and waggon-making shop, which did the work of the neighborhood, doing a large and profitable business. It was conducted by slaves, the principal one having been purchased by the elder Woods, and others afterwards learned the trade. During the life-time of the elder brother he conducted all the affairs of the plantation—the younger brother taking no part—he having contracted habits of intemperance at 16 years of age, and they continued until his death. During the last five or six years of his life he drank very hard, and drinking made him habitually dull and stupid. He was naturally of feeble mind, and made but little progress in learning when at school, and the witness scarcely ever saw him sober for the last three or four years of his life. He had no capacity for business when under the influence of drink, and when so had a stupid look, and seemed insensible to things around him. He was incapable during the last few years of his life of doing any business of importance. His business was managed and attended to by agents.

Another witness testified that the intestate, from his habitual intemperance, was entitely incapable of transacting any serious business whatever during the last years of his life, but more especially during the summer of 1840. That the plaintiff was his overseer, and had the collection of the money due to the shop during the whole period he was in the intestate's employ.

Another witness testified that he attended and managed the business of the intestate, except that connected with the plantation under the management of the plaintiff—that the intestate resided in Selma at the distance of some 30 miles from his plantation—that in the summer of 1840, the precise

Hale, et al. v. Brown.

time he did not remember, the witness, on entering the house where he resided with the intestate, found him and the plaintiff seated at a table with a number of papers, and seemed to be engaged in some sort of business. The intestate was then very drunk but did not stagger. As soon as the witness entered, the plaintiff in apparent confusion and haste, took the papers from the table, and put them in his hat. After this, all three went into an adjoining room, where the witness saw liquor and glasses, and the intestate and plaintiff drank ; this was near the hour of dining, and after dinner the witness left the intestate and plaintiff together. Witness never knew of any indebtedness, or reason for any indebtedness from the intestate to the plaintiff, except for his wages as overseer, and believes if any other had existed he would have known of it. The witness also stated his belief that the plaintiff knew that he and another person were the agents for the intestate, as it was published in the Selma paper. The plaintiff told this witness that he had one year sold for the intestate 2000 bushels of corn. This witness also testified that the intestate was for some time at the Universities of Alabama and Virginia.

Another witness testified that he with the one last named, were the general agents of the intestate—that the plaintiff never applied to him for any settlement or set up any claim against the intestate—that the intestate called at the witness' office in Selma, and asked for blank notes, stating he was going to his plantation to have a settlement with the plaintiff—witness then filled up the date of a note, and inserted the name of Brown as the payee, and handed it to the intestate, but did not insert the sum. He did not know whether the intestate went to his plantation on the same day—that the intestate was sober when he called for the notes, and when in this condition, in the judgment of witness, was capable of making ordinary contracts.

Another witness testified that the plaintiff commenced overseeing for the Woods in the spring of 1833 ; that he stated to witness he was worth nothing then, and was $1200 or

$1300 in debt.   He continued as overseer until the end of 1841.

Another witness stated that when the plaintiff left the plantation of Woods in 1842, he owned 260 acres of good land, for which he owed $1500 ; it cost twelve and an half dollars per acre for part, and fifteen dollars the remainder ; also fourteen horses and mules, and a jack ; six grown negroes, a negro woman, and several children, with some other property, estimated in value from nine to ten thousand dollars.   The plaintiff kept his horses at Woods' plantation.  Woods' hands cleared fifty acres of the land belonging to the plaintiff before he owned any slaves, and afterwards aided him to clear thirty acres more, but after the plaintiff became the owner of slaves, they were seen at work on the intestate's plantation.

It was also in proof by several witnesses, that they had paid the plaintiff for work done at the shop on the plantation of the Woods'.

Another witness stated, the plaintiff told him after the death of the elder Woods, that his wages were paid out of collections made by him from the shop, and that in one year besides paying himself his wages, it had made the elder Woods as much as $1500 collected for smith's work.

Another witness stated, that he as *administrator ad colligendum*, called on the plaintiff after the death of the intestate, and he then said he had notes and accounts to the amount of $1600 for work done in the shop.  These were left in his hands.   He then said the estate owed him for wages, but did not state the sum, and also for 540 bushels of corn. He also stated he owed the estate for blankets, negro clothing, shoes, and bagging, used by him in the life-time of the elder Woods.

The defendants then put in evidence three account books, all in the hand-writing of the plaintiff, two of which consisted of entries of charges against the customers of the shop for work done there, and the other containing entries of the amounts of monies received or collected on the accounts charged on the two first mentioned—from whom collected—to whose account credited—and in what manner the same was disbursed, and by whom.   The said books run through several years down to the period when the plaintiff left the plan-

Hale, et al. v. Brown.

tation.    From this book the plaintiff appeared to apply receipts sufficient to pay his wages annually as overseer, down to the year 1841.

In the course of the examination of some of the witnesses for the defendants, who had been customers of the shop, as to the sums paid by them to the plaintiff, they stated the shop appeared to have a good custom, and during a part of the life-time of the elder Woods was crowded with business; that it was carried on with one forger and two hands ; that there appeared to be as much work as the two hands could perform.    The defendant then proposed to ask witnesses to state their opinion what a smith's shop in that neighborhood under similar circumstances would make per year, but as these witnesses were not blacksmiths, the court refused to permit the question to be answered.    It was also shewn that the notes and accounts in the hands of the plaintiff when the conversation was had with the administrator *ad colligendum*, amounted to $1600, part contracted in the life-time of the elder Woods, and part afterwards, and were demanded from the plaintiff, who refused to deliver them until he was paid.

When the evidence was disclosed of the joint ownership of the property by the Woods', and their joint interest in carrying on the plantation, it was offered under the plea of set-off, and the court excluded it on the objection of the plaintiff.    The defendant then proposed to offer it to show the want of consideration for the note, insisting that was given for services as overseer during the continuance of the joint interest, and that the same were fully paid for by collections made by the plaintiff.    The court permitted the evidence to go to the jury, to show fraud and imposition in obtaining the note.

The plaintiff, in conclusion, offered evidence tending to shew the intestate was capable, when sober, of attending to business, and that he was so about the time the note was dated.

On this state of proof the defendants requested the court to charge,

1.  That if the intestate, at the time he gave the note, was so intoxicated as to be incapable of business, then it was void.

2.  That if his mind was naturally weak, and at the time

the note was given was so much weakened and destroyed as to render him incapable of making such a contract, in that event the note was void.

3. That if the plaintiff took advantage of the intestate's weak and drunken condition, and obtained the note by fraud, then the note should be wholly set aside.

4. That even if the plaintiff practised no fraud, and the intestate was of sound capacity, yet if nothing was owing when the note was given, then there was no consideration, and the jury should set it aside.

5. That, if during the life of the elder Woods, the plantation and shop was conjointly used and carried on for the joint account of the brothers, and that the intestate was the survivor, then that any debts which the plaintiff collected and owed them on that account, are subjects of set off in this case.

6. That if the money was received on accounts of the shop after the death of the elder Woods, it is a good set off, although the work was done in his lifetime.

7. That all moneys received for work done or corn sold since the death of the elder Woods, are good sets off, and should be allowed in this case.

8. That if there was no indebtedness of the intestate to the plaintiff, and no consideration for the note, it should be set aside.

9. That if the note was obtained by fraud or imposition, it was void.

10. That if on the whole proof, they should believe the plaintiff was indebted to the estate on account of the matters allowed as evidence of set off, they must not only find for the defendants, but certify the balance.

11. That although the moneys collected in the lifetime of the elder Woods was not good as set off, yet if they were received by the plaintiff in payment of his wages, and his wages were so paid, then that such receipts in the lifetime of the elder Woods and since his death, were good as payment of his wages.

12. That if the intestate's mind was naturally weak, and had at the time the note was given been so much weakened and destroyed as to render him incapable of making a con-

tract such as this, with understanding and judgment, that it was incumbent on the plaintiff to show, the note was given for a good consideration.

13. That if the intestate was incapable of making a contract when drunk with reason and judgment, and was generally and habitually in that condition, then it was incumbent on the plaintiff to show he was not drunk when the note was executed.

14. That the giving of a note is not necessasily binding, but is of no effect when it is shown to be without consideration, or if it is shown it was obtained by fraud, or if it appears the person giving it was not in a situation to give a note with understanding and reason, from drunkenness or any other cause.

15. That if the note was given under suspicious circumstances, and when the intestate was in a weak and drunken condition, it is a strong badge of fraud if the plaintiff does not make out a fair case, and show a good consideration.

16. That as to the consideration of the note, and the intestate's condition, when he gave the note, it was unnecessary for the defendants to produce any positive evidence, provided they show facts and circumstances sufficient to convince the minds of the jury.

These were all given, with the exception of the 2d, 5th, 6th, 12th, 13th, and 15th.

At the request of the plaintiff, the court charged—

1. That there is no medium between capacity and incapacity to make a contract—that a legal capacity to make any contract, is a legal capacity to make all contracts, and that capacity is not governed by the importance of the contract to be made.

2. That there is no law which graduates the legal capacity by the particular contract made.

The defendant excepted to all the rulings of the court against him, except the refusal of the 13th charge, and to the charges given at the request of the plaintiffs.

Wm. Hunter, for the plaintiff in error, insisted—

1. The opinions of witnesses as to the annual value of the smith's shop, was proper evidence. This is not a question

of skill, as to which an *expert* alone can speak, but is evidence entirely independent of the act.  [Kelly v. Kenson, 14 S. & R. 137.]

2. The evidence of set-off should have been admitted to the jury.  The sole right of action on the demands was with the intestate, after the death of his joint tenant, or copartner, and the charge refused in this connection should have been given.  [Chit. Pl. 555; Collyer on Part. 448; Cary on do. 6, 133; Gow. on do. 168, 233, 173; Slipper v. Stidstone, 5 Term, 493; French v. Andrade, 6 ib. 582; Childress v. Emory, 8 Wheat. 669.]

3. If the mind of the intestate was so weak as to be incapable of making a contract, the cause of the weakness is immaterial, and the contract is void.  [Story on Con. 23, 24, 27; Story on Notes, 101; 3 Stark. Ev. 1701, 1703; 3 C. & P. 1; Pitt v. Smith, 3 Camp. 33.]

4. The evidence fairly considered, raises grave suspicions as to the fairness of the supposed settlement, when the note was given, and it rested with the plaintiff to show an adequate consideration for the note, as called for by the 15th charge. [Chitty on Bills, 78, 83, note R.; Ib. 637, note W. a; 2 Philips' Ev. 8; Cowen & Hill's Notes to do. 18; Heath v. Samsom, 2 B. & Ad. 291; Bassell v. Dodgin, 10 Bing. 40; 4 Taunt. 114; Duncan v. Scott, 1 Camp. 100, 2 Ib. 574; Osmond v. Fitzroy, 3 P. Wms. 130; 2 Ib. 203; Stock. on Non Com. 18.]

G. W. Gayle and E. W. Peck, contra, argued—

1. The evidence in relation to the set off, of the value of work done previous to the date of the note, was properly rejected; as that closed all accounts up to the date.  [Copeland v. Clark, 2 Ala. Rep. 388.]  The evidence however was allowed in another aspect, and therefore worked no injury, as, until the note was set aside, there was no pretence to let in the set off.

2. The cause was properly submitted to the jury on the charges given; the 5th and 6th charges refused attempted to draw a distinction between contracts *such as this*, and other contracts, when the law makes no distinction in the capacity

to make different kinds of contracts.   [McElroy v. McElroy, 5 Ala. 81; Parkman v. Ely, Ib. 346.]

3. The fact that a note would be void, if made when the intestate was drunk, imposed no obligation on the plaintiff to show he was sober.   That he was so, is the legal presumption, and it rested with the defence to show it was otherwise.   [Greenl. Ev. 91, § 80; Story on Cont. § 27; 5 Ala. Rep. 241.]

4. The note itself imports a consideration, and it was for the defence to show it had none to sustain it.   The 15th charge was properly rejected.   [Digest, 340, § 152; Chamberlayne v. Darrington, 4 Porter, 515; Clark v. McAfee, 7 Ib. 62; Young v. Foster, Ib. 420; Parkman v. Ely, 5 Ala. Rep. 346.]

GOLDTHWAITE, J.—1. From the facts stated in this bill of exceptione, the case evidently belongs to that class in which a jury is rarely, if ever, mistaken upon the merits, unless led astray by some misconception of the law which should govern it, and therefore their verdict ought not to be disturbed, when the error is not entirely apparent.   Several of the charges refused by the court, as well as one of the matters ruled at the trial, may involve abstract error, but which, however, vanishes when the whole case is considered, except in one particular.

The first point insisted on by the counsel, for the reversal of the judment, is, the exclusion of the opinions of witnesses with reference to the annual value of the work done at the smith's shop.   Without debating how far the reason is sound, on which, apparently, these opinions were rejected, or whether in a proper case they might not be admissible, we are clear they were not so in this.   If the annual value of the work was made to appear, there is nothing in the proof to make the plaintiff chargeable with it, except so far as collections were actually made by him, or the proceeds of the shop appropriated to his use.   To this extent only could he be considered the debtor of his employers, and the sums could be shown by better evidence than ascertaining the probable annual value, and the showing of that, had no ten-

dency whatever to fix the sums received by the plaintiff. [Barker v. Sample, 6 Ala. Rep. 255.]

2. The connection between the brothers, in carrying on the plantation and shop, appears from the proof to have been in the nature of a partnership, and so considered, it is clear the survivor was in law entitled to the outstanding dues. The debts collected by the plaintiff, although accruing when both brothers were living, became the property of the intestate, as the survivor, and the sum collected was a proper matter of set off to an ordinary demand of the plaintiff. [Slipper v. Stidestone, 5 Term, 493; French v. Andrade, 6 Ib. 582.] And the rule is the same if the brothers are considered as joint tenants. [Chitty's Pl. 21, 77.] It is possible the court below took a different view of the law than this, though here we may be mistaken, as the proof rejected under the pléa of set off, was let in to show fraud and imposition in taking the note. The abstract error, even if the court misconceived the law, was calculated to produce no injury, as the note, if fairly obtained, was entitled to be considered as the settlement of all outstanding accounts. [Copeland v. Clark, 2 Ala. Rep. 388.] The jury having found the amount of the note for the plaintiff, it seems they did not consider the fraud as established, and therefore we should not feel warranted in reversing on this ground, although satisfied that the law of set off was mistaken in the court below.

3. The 2d and 12th charges which the court refused, seem to indicate the impression of the defendants, that a distinction could be taken with respect to the legal capacity to make different kinds of contracts, for they expressly put the request with reference to *such a contract as this*. The impression is more obvious from the circumstance, that a different charge was given on this identical point. In this view, both charges were properly refused, as the capacity to make any contract, is so to make all contracts. [McElroy v. McElroy, 5 Ala. Rep. 81.] If *monomania* is to be considered as creating an exception to this general rule, it is sufficient to say, there was no pretext of that here.

4. Notwithstanding the strong disinclination we feel to send a case like this to a second trial, after what seems to us to have been a full examination of all the facts and circum-

stances of the transaction, we find it impossible to sustain the refusal to give the 15th charge as requested by the defendants. The note certainly imports a consideration, but in the nature of things, it is generally difficult, and frequently impossible, to prove the want of consideration, except by showing circumstances tending to cast strong suspicion of imposition, or mistake in the transaction. The *onus* of proving the note was without consideration, was on the defendants; but when a case is made by them, from which the inference is fair, that either no consideration, or one of a particular kind was at its foundation, the *onus* was then shifted to the opposite side, to sustain the note, by showing what the consideration was. It is said, that in the examination of a contested fact, the *onus probandi* may, in the course of the trial, be thrown from one party to the other several times, according as the complexion of the proof may vary. [Cowen & Hill's Notes, 475; Brooks v. Barrell, 7 Pick. 94.] A note is the statutory evidence of a debt, but not in its nature conclusive, or incapable of contradiction; it is therefore subject to be rebutted by any proof which satisfies the jury against it; and in our judgment, no rule can be more just, than one which requires the presumption of imposition, or mistake, to be rebutted by showing the real consideration for which the note was given. Even when the action is by an indorsee, and the note is shown to be without consideration, or a strong suspicion of fraud is raised, the plaintiff is required to support his title by showing the consideration paid by him for the note. [Marston v. Forward, 5 Ala. Rep. 347; C. & H's Notes, 477; 2 Greenl. 146, § 172.] It would be strange if a more liberal rule was extended to the original party. We are not called on here to weigh the evidence, or to express an opinion upon the preponderance of the one or the other scale, nor is it doing so to say, the defendant's proof made a *prima facie* case, that the only consideration for this note was, the sum due at its date, from the intestate to the plaintiff, on a settlement of the accounts between them. If this proof necessarily created the presumption, either that nothing was due, or a less sum than the note called for, these were suspicious circumstances, and if not rebut-

ted by showing another consideration for the note, certainly warranted the presumption of fraud, or, in the language of the request, was a strong badge of fraud, when connected with the fact that the settlement was made with a man of weak intellect, to say nothing of him as an habitual drunkard.

The refusal of this charge may have had a direct influence on the verdict. The court refusing to instruct the jury, that these circumstances of suspicion did not call on the plaintiff for rebutting proof, may have induced the impression, that the legal force of the note, as ascertaining the extent of the debt, was unimpaired. If the jury acted on this impression, they could do no otherwise than return a verdict for the amount of the note. We are not authorized to speculate, whether the verdict was found on the whole evidence before the jury, as the result we have stated may have been the consequence of the refusal.

For the error in refusing this charge, the judgment is reversed and the cause remanded.